# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION

UNITED STATES OF AMERICA

v.                                                                           No. 5:22-cr-15-BJB

MICAH C. GRAY

*****

## MEMORANDUM OPINION & ORDER

Officers from the Pennyrile Narcotics Task Force arrested Micah Gray on August 27, 2021, for allegedly distributing methamphetamine. The officers then executed a warrant to search Gray's apartment and later obtained and executed a warrant to search the car he was arrested in. Gray moved to suppress all evidence discovered at his apartment and in the car. Motion to Suppress (DN 34) at 3.

## THE RECORD

Detective Michael Lantrip testified at the suppression hearing that he and other law-enforcement officers had worked with a confidential informant who purchased meth from Gray on three separate occasions on August 26 and 27. Hearing Tr. (DN 45) at 24:10–15. Each of these three transactions, according to a search-warrant affidavit filed by officers who observed them, "occurred in the parking area immediately outside" Gray's apartment. Pre-Arrest Search Warrant Affidavit (DN 39-1) at 2. Based on these purchases, Lantrip and his colleague, Detective Trent Fox, applied for a warrant to search Gray's person, apartment, and any vehicles parked outside. *Id.* at 3. Caldwell County District Judge Natalie White signed the warrant and emailed it back to the detectives on August 27. Email from Judge White (DN 39-4). On the same day, the officers directed the informant to set up a fourth purchase, which they intended to observe before arresting Gray. Hearing Tr. at 29:5–7 (describing "buy-bust takedown" plan).

When the informant reached out, Gray told him to go to the Walmart parking lot, not his apartment. *Id.* at 29:8–9. This raised concerns among the detectives that Gray might have spotted the police or otherwise become suspicious of the informant. The officers nevertheless relocated the operation to Walmart in accordance with Gray's instruction. *Id.* at 29:9–10. But then Gray told the informant to move the location again. The officers—by now suspecting that Gray was onto their plan—called off the buy. *Id.* at 29:10–13. While they monitored the informant leaving Walmart, Lantrip noticed that a black Lexus he had seen driving around the area "two or three times" seemed to be following the informant. *Id.* at 29:14–17; 35:2–18. Fox testified that the informant also noticed the Lexus and told the officers that it might belong to Gray. *Id.* at 20:4–5.

1

So the officers changed course. Lantrip contacted Fox, who pulled behind the Lexus and ran its license plate. Fox learned the car was registered to a Tabitha Gray, whom he believed to be a relative of Micah's. *Id.* at 20:6–7 ("So I get behind the vehicle and run the plate and find out that it's actually registered [to] one of his family members."). Lantrip suspected the car's occupants were somehow involved with the deal between Gray and the informant. *Id.* at 33:1–6 ("I had seen the vehicle three times in our vicinity, and I suspected it was following or doing surveillance on us…. I suspected [Micah Gray] was in the vehicle and contacted Detective Fox."). Fox pulled over the Lexus and found Micah Gray in the passenger seat. The officers then arrested him, seized the car, and executed the previously-issued search warrant at his apartment. *Id.* at 29:21–25. Lantrip testified that the officers found drugs, drug paraphernalia, and a gun inside Gray's apartment. *Id.* at 30:2–4. After securing and impounding the car, the following Monday officers obtained a separate warrant to search the car. *Id.* at 10:16–25; Post-Arrest Search Warrant (DN 39-8). Neither side has specifically identified what officers found in the car that is potentially relevant to this prosecution.

## GRAY'S ARGUMENTS

Gray attacks the legitimacy of both search warrants and the traffic stop. He asserts that procedural defects render both warrants ineffective, that neither warrant affidavit substantively established probable cause, and that police lacked a lawful basis for pulling over the Lexus before his arrest. Gray does not, however, specifically identify what officers found in the car that he seeks to suppress; instead, he has asked the Court generally to suppress "[a]ny evidence obtained from the search of that vehicle." *See* Motion at 3; *see also* Def. Post-Hearing Br. at 11 (DN 50) (seeking to suppress all "the evidence obtained as a result of the search of the residence and vehicle.").

### A. Procedural Defects

Gray maintains that "[t]he search warrant[s] for both the car and the apartment are invalid" because "Det. Trent Fox was not an official authorized to administer oaths." Def. Supp. Br. (DN 38) at 2. Under Kentucky's Rules of Criminal Procedure, a judge may issue a warrant based on an affidavit "sworn ... before an official authorized to administer oaths." Ky. R. Crim. P. 13.10(1). And for both warrants, Detective Lantrip swore the affidavit before Detective Fox, who sent the sworn affidavits to Judge White as support for the warrant request. Hearing Tr. at 11:6, 26:15–19. Gray argues that Fox didn't have authority to administer Lantrip's oath, but undisputed record evidence offered at the suppression hearing shows Fox had (and still has) authority to administer oaths to support search and arrest warrants. General Order (DN 39-2); Hearing Tr. at 11:14–24. At the hearing Gray offered no reason, given this fact, why Fox's involvement would invalidate the warrants. Hearing Tr. at 11:14–24; 12:12-15:11.

Second, Gray argues that "[t]he search warrant[s] must be set aside because the Caldwell District Court did not comply with the dictates of [Kentucky Rule of

Criminal Procedure] 13.10." Def. Post-Hearing Brief at 10. Rule 13.10(1) authorizes affiants to swear out a search-warrant affidavit "either in the presence of or through reliable electronic means, before an official authorized to administer oaths." Subsection 2 provides that when using "a reliable electronic means ... in lieu of actual presence before an official authorized to administer oaths, ... [t]he official administering the oath shall certify on the affidavit or an accompanying document that the oath was taken while in oral communication." KY. R. CRIM. PRO. 13.10(2). So the rule requires the official administering an oath to note when an affiant and the official communicate "through reliable electronic means" rather than in person. Nothing in the record suggests Fox didn't do that here.

When Gray first raised this issue, he attacked the validity of Judge White's approval of both warrants based on the lack of any "notation on either search warrant that the judge signed them while in electronic communication." Def. Supp. Br. at 2. But the portion of Rule 13.10 that Gray relies on governs the swearing of oaths in warrant applications, not the approval and issuance of those warrants. The certification for oaths sworn through "reliable electronic means" does not require judges to indicate that they signed a warrant with electrons rather than ink.

Gray's post-hearing brief, however, changes its tune. Gray now argues that the warrant fails because Detective Fox "did not check" the box indicating that he was "in oral communication" with Detective Lantrip "on either the affidavit for the car or the house." Def. Post-Hearing Brief at 11. But it is undisputed that Detective Fox personally administered both oaths to Detective Lantrip before emailing the warrant to Judge White. Hearing Tr. at 11:6, 26:15–19. So no "in oral communication" annotation was necessary under Rule 13.10.

Even if these warrants were procedurally deficient under state law, Gray has supplied no reason why suppression would be the appropriate response in federal court. "The exclusionary rule is a judicially fashioned remedy aimed at deterring constitutional violations, the application of which is appropriate when the Constitution or a statute requires it." *United States v. Abdi*, 463 F.3d 547, 555 (6th Cir. 2006). Gray has not identified any authority suggesting that alleged state procedural violations like the ones alleged here would rise to the level of a federal constitutional violation warranting suppression. "The commonly-held position is that federal, not state, law governs the question of the validity of a search warrant in a federal criminal proceeding." *United States v. Shields*, 978 F.2d 943, 945 (6th Cir. 1992); *cf. United States v. Searp*, 586 F.2d 1117, 1125 (6th Cir. 1978) (suppression not justified "[w]hen there has merely been a violation of [federal] procedural rules" and no showing of "bad faith conduct" or "prejudice to the defendant"). And as discussed below, nothing in the record suggests the officers didn't act in good faith. *See* Part B.2 (discussing *Leon*'s good-faith exception); *Shields*, 978 F.2d at 947–48 (applying good-faith exception to purported procedural violation). Nor is it clear that suppression would be warranted even under Kentucky law. *See Copley v. Commonwealth*, 361 S.W.3d 902, 907 (Ky. 2012) (suppression not required although

3

"Rules 2.02 and 13.10 were not properly complied with and the search warrant was technically deficient").

Given his failure to address bad faith, prejudice, or the doctrinal basis for suppression, that remedy is plainly unjustified here.

## B. Pre-Arrest Search Warrant

### 1. Overbreadth

The August 27 warrant authorized police to search Gray's person, apartment, and "any and all vehicles located on the premises." Pre-Arrest Search Warrant (DN 39-1) at 3. The authorization to search all on-site vehicles, according to Gray's opening brief, renders the warrant impermissibly overbroad because "[t]he warrant was executed at a multi-unit apartment complex" and many of the "vehicles located on the premises" had no connection to Gray or his alleged crimes. Motion at 3 (cleaned up).*

The overbreadth doctrine in search-and-seizure law requires that warrants describe the place to be searched with particularity. *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001). But even assuming the warrant was overbroad, suppression wouldn't follow. "[I]nfirmity due to overbreadth does not doom the entire warrant; rather, it requires the suppression of evidence seized pursuant to that part of the warrant." *Id.* (quotation marks omitted). Gray hasn't identified any evidence seized from any vehicle under this warrant. *See* Gov. Post-Hearing Br. (DN 51) at 6 ("[N]o evidence was seized pursuant to the apartment search warrant from any vehicle."). So even if Gray is correct—which the Court need not decide—evidence seized under other portions of the warrant need not be suppressed. *See Greene*, 250 F.3d at 477.

### 2. Probable Cause

In his supplemental briefing, Gray argues that the warrant "affidavit was insufficient to establish the probable cause necessary to obtain [the] search warrant for the home." Def. Supp. Br. at 4. That is because it purportedly "fail[ed] to establish the necessary nexus between the place to be searched and the evidence sought." Def. Post-Hearing Br. at 7 (quoting *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016)).

"The standard of review for determining the sufficiency of the affidavit is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place

---

* Gray has arguably abandoned this argument. In his post-hearing brief, defense counsel said that "Mr. Gray is not going to offer any additional argument on the following two issues: whether the oath supporting the affidavit was valid; and the reference in the warrant to any and all vehicles located on the premises." DN 50 at 1. At a minimum, Gray offered nothing to rebut the Government's assertion that this warrant led to no seized evidence.

4

cited." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quotation marks omitted). To establish probable cause to search a home, the warrant "affidavit need[s] to demonstrate probable cause (1) that [the suspect] was trafficking drugs; (2) that [he] lived at the [target] residence; and (3) that evidence of drug trafficking would be found at [his] residence." *United States v. Sumlin*, 956 F.3d 879, 885 (6th Cir. 2020). Gray hasn't challenged the affidavit on the first two points. But he argues that the affidavit lacks a sufficient "nexus" between his apartment and the alleged drug trafficking; that is, he believes the officers seeking the warrant lacked probable cause to believe evidence of drug trafficking was likely to be found in his apartment. Def. Post-Hearing Br. at 10.

Two features of the affidavit, however, provide "a substantial basis" for Judge White's conclusion that evidence of Gray's alleged drug dealing "would be found" inside his apartment. *Rodriguez-Suazo*, 346 F.3d at 643.

*First*, the affidavit indicates that investigators "utiliz[ed] a confidential informant" to conduct three controlled purchases of methamphetamine. Pre-Arrest Search Warrant Affidavit at 2. Officers observed each transaction by "utilizing audio/video recording equipment" and confirmed through Tru-Narc field-testing that the purchased drugs contained methamphetamine. *Id.* This "recent, reliable evidence of drug activity" even without additional information "provide[s] a reason to believe that drugs or other evidence of crime [will] be found in the suspect's home" because "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Reed*, 993 F.3d 441, 448–49 (6th Cir. 2021) (quotation marks omitted).

*Second*, the affidavit indicates that the "controlled purchases occurred in the parking area immediately outside" Gray's residence. Pre-Arrest Search Warrant Affidavit at 2. This proximity links Gray's alleged drug-dealing conduct and his home: a suspect's "status as a drug dealer plus observation of drug activity near defendant's home is sufficient to establish probable cause to search the home." *United States v. Berry*, 565 F.3d 332, 339 (6th Cir. 2009) (probable cause for search of home existed based on drugs found in suspect's car, which was parked in the driveway of his home). Unlike in *United States v. Brown*, on which Gray relies, here law enforcement and the state magistrate didn't rely on Gray's "status as a drug dealer, *standing alone*," as the only link between the suspect's home and his alleged crimes. 828 F.3d 375, 384 (6th Cir. 2016) (emphasis added). Rather, the affidavit's description of recent, reliable evidence of Gray's alleged drug dealing in close proximity to his home provides a substantial basis for finding "probable cause to believe that evidence would be found" in Gray's home. *Rodriguez-Suazo*, 346 F.3d at 643. So the affidavit establishes the nexus "between the alleged drug activity and the place to be searched" that Gray insists is missing. Def. Post-Hearing Br. at 8.

Gray cites a handful of precedents to argue that an affidavit must also: (1) provide more than "a suspect's mere presence outside of a residence," (2) recite "the officer's training or experience," (3) "refe[r] to the informant's reliability," and (4) note

5

whether the informant had been in "or had seen drugs or other evidence inside the apartment." Def. Post-Hearing Br. at 6–8 (citing *United States v. Savoca*, 761 F.2d 292 (6th Cir. 1985); *United States v. McPhearson*, 469 F.3d 518 (6th Cir. 2006); *United States v. Reed*, 993 F.3d 441 (6th Cir. 2021); *United States v. Higgins*, 557 F.3d 381 (6th Cir. 2009); *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016); *United States v. Flores*, 679 F.2d 173 (9th Cir. 1982); *United States v. Brooks*, 594 F.3d 488 (6th Cir. 2010); *United States v. Frazier*, 423 F.3d 526 (6th Cir. 2005)).

But these decisions don't stand for such sweeping rules. *Savoca*, for instance, invalidated a search warrant in which the affidavit indicated only that two bank-robbery suspects "had been seen" in a target motel room "on two prior occasions. 761 F.2d at 294. The court held that the defendants' "mere presence" outside the residence wasn't enough to avoid suppression. *Id.* at 297; *see also Flores*, 679 F.2d at 175–76 ("affidavit stated only that one suspect was seen in the house and that the other was arrested there"). Here, however, the warrant affidavit established that Gray both lived in the apartment and had been selling drugs in the parking lot just outside. Pre-Arrest Search Warrant Affidavit at 2.

Gray's arguments that an affidavit must recite an officer's experience and details about an informant get him no further. *Reed* simply states that an "affiant officer's experience that drug dealers keep evidence of dealing at their residence" can be "*an additional reason* to find probable cause to search the drug dealer's home." 993 F.3d at 448 (quotation marks omitted) (emphasis added). And the affidavit in *McPhearson* fell short because it indicated only that McPhearson had crack cocaine in his pocket when police arrested him on an unrelated assault warrant. 469 F.3d at 522. In this context, the district court opined that a discussion of the "officer's experience in drug law enforcement" might have made an otherwise bare-bones affidavit stronger, but that doesn't mean that every affidavit needs this information. *Id.* at 522–23 (quoting district court's oral ruling on motion to suppress); *see also Higgins*, 557 F.3d at 389–90 (rejecting warrant relying entirely on informant's tip because affidavit "did not attest to the informant's reliability" or state the informant "had been inside" or "had ever seen drugs or other evidence inside" the apartment); *Frazier*, 423 F.3d at 532–33 (similar).

Even if the warrant affidavit hadn't established probable cause, the good-faith exception from *United States v. Leon* would weigh against suppression. Unless an affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," suppression is unwarranted because "the marginal or nonexistent benefits produced by suppressing evidence ... cannot justify the substantial costs of exclusion." 468 U.S. 897, 922–23 (1984) (quotation marks omitted). A warrant affidavit will pass this test so long as it provided "some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched." *Reed*, 993 F.3d at 451 (quotation marks omitted). The affidavit here connected Gray to the target address, established that he had sold methamphetamine in the parking lot "immediately outside" his apartment, and noted that officers had observed the

6

purchases and confirmed that the purchased drugs contained methamphetamine. Pre-Arrest Search Warrant Affidavit at 2; *see also Reed*, 993 F.3d at 451–52 ("recent, reliable evidence of drug activity" will often justify the search of a suspect's home). So even assuming the Court agreed with Gray and disagreed with Judge White regarding probable cause, the good-faith exception would apply and defeat the argument for suppression.

**C. Post-Arrest Search Warrant**

Similarly, Gray argues that "[a]ny evidence obtained from the search of that vehicle" should be suppressed because the post-arrest search warrant affidavit didn't "establis[h] a sufficient nexus between the drug transactions and the search of the vehicle." Motion at 3; Def. Post-Hearing Br. at 10. Gray does little to develop his nexus argument regarding the Lexus—opting not to "rehash the arguments he made" about the apartment search "because they are virtually identical." *Id.*

But are they? The two precedents Gray discusses most—*Brown* and *Reed*—both declined to find probable cause to search a home based on the occupant's perceived status as a drug dealer and nothing more. But courts treat homes and automobiles quite differently under the Fourth Amendment. *See, e.g., South Dakota v. Opperman*, 428 U.S. 364, 367 (1976) ("Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office."). Indeed, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). So as long as they have probable cause to believe the car contains evidence of a crime, officers generally can search it with or without a warrant. *See Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999).

Under this probable-cause standard, the affidavit here clearly sufficed. By the time the officers sought a second search warrant, they had already stopped the Lexus, arrested Gray, and searched his apartment. The affidavit for the warrant to search the car described the controlled purchases that provided the basis for the pre-arrest search warrant and noted that "[i]llicit substances were located during" the search of Gray's apartment on August 27. Post-Arrest Search Warrant Affidavit (DN 39-8) at 2. It also explained that when the officers arrested Gray, Gray was in "the vehicle in question" and was "communicating with the confidential informant ... arranging a meeting place to conduct the [fourth] transaction." *Id.* And as the affidavit indicates, the "nature of the sale of illicit substance(s) would allow illicit substance, paraphernalia, and monies to be hidden inside the vehicle." *Id.* So the affidavit linked Gray's alleged crimes to the Lexus he was riding in based on his and the car's very recent involvement in suspected drug trafficking.

Even if the warrant were defective, the search would still be lawful under the automobile exception to the warrant requirement. *See United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007). "The automobile exception allows officers to search a vehicle without a warrant if they have 'probable cause to believe that the vehicle

7

contains evidence of a crime.'" *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (quoting *Smith*, 510 F.3d at 647). Officers arrested Gray on Friday, August 27, and obtained a warrant to search the car on Monday, August 30. By that time, they had searched Gray's apartment and found a "multitude of drugs," "a loaded handgun," "some pills," and "lots of paraphernalia." Hearing Tr. at 30:2–4. And they already had evidence related to the three controlled purchases of meth. *Id.* at 30:13–17. Additionally, Gray was in the car and on his way to a fourth transaction with the informant when he was arrested. *Id.* at 29:14–20. Under the totality of these circumstances, officers had a "reasonable grounds for belief" that "the vehicle contain[ed] evidence of" Gray's alleged drug-trafficking crimes. *See Smith*, 510 F.3d at 647–48 (quotation marks omitted).

### D. Traffic Stop

Finally, Gray seeks to suppress all evidence recovered during the August 27 traffic stop. Initially, Gray argued—citing *United States v. Hensley*—that the Fourth Amendment does not permit police to "sto[p] a person because they suspec[t] he was involved in a completed crime." Motion at 2 (quoting *United States v. Hensley*, 469 U.S. 221, 226 (1985)). But *Hensley* held the opposite. "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Hensley*, 469 U.S. at 229. So this argument fails as a matter of law.

Gray now contends that the Court should suppress evidence "obtained from the stop and search of the 2011 Lexus" because "there was neither a traffic violation nor any reasonable suspicion" to justify the stop. Def. Post-Hearing Br. at 2. Officers, according to Gray, initiated a traffic stop based on "little more than a hunch that [he] was in the vehicle" and "an assumption about who was in the vehicle based on who owned it." *Id.* at 3, 5. And he insists that this was insufficient because "they were not able to identify him before the stop; there was no traffic violation; and there was no arrest warrant." *Id.* at 5.

Police may conduct an investigatory stop on a vehicle based on "reasonable suspicion ... that the stop will produce evidence of a crime." *United States v. Marxen*, 410 F.3d 326, 331 (6th Cir. 2005). "[T]here is reasonable suspicion to stop a car where officers, taking the totality of the circumstances, put forward 'a particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Smith*, 74 F.4th 799, 801 (6th Cir. 2023) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Officers must have more than "a mere hunch" that something is afoot, but "can draw on their own experience and specialized training to make inferences and deductions." *Id.* (quotation marks omitted). And "'the degree of suspicion' required ... is quite low: 'a moderate chance of finding evidence of wrongdoing.'" *United States v. McCallister*, 39 F.4th 368, 373–74 (6th Cir. 2022) (quotation marks omitted).

In this case, the officers suspected that someone in the black Lexus was watching them and interfering with their attempt to conduct a controlled buy leading

8

to the arrest of Gray. So they stopped the car to investigate. At the hearing, Detective Lantrip noted that he was immediately concerned about counterintelligence when Gray moved the sale location from his apartment complex to another location. Hearing Tr. at 29:8–13. The three previous transactions had taken place in the parking lot outside Gray's apartment, so this sudden change signaled to the officers that Gray might be onto them. Once Gray moved the sale again, the officers called off the operation and began to wind things down. *Id.* at 29:10–13. Around that time Lantrip—and apparently the informant—noticed a black Lexus that had been at the first location and became suspicious that someone in the car was observing (and frustrating) their operation. *Id.* at 20:4–5; 29:14–17; 33:15–18. Discovering that the car was registered to someone who shared Gray's last name reinforced that suspicion, so they stopped the car to investigate whether anyone in the car had connections to Gray. *Id.* at 20:6–10; 32:24–33:9. Contrary to Gray's argument, the officers didn't stop the car based on "a hunch that [he] was in the vehicle" or "an assumption about who was in the vehicle based on who owned it." Def. Post-Hearing Br. at 3, 5. Rather, they stopped the car because they suspected Gray of drug trafficking, began watching for signs of counterintelligence once Gray directed the informant to a location other than Gray's apartment for the fourth sale, noticed that the black Lexus had been at both locations, and discovered that the car belonged to someone who shared Gray's last name. Hearing Tr. at 29:14–20; 33:15–18. Based on "the totality of the[se] circumstances," *Smith*, 74 F.4th at 801, the officers reasonably suspected that someone in the car was involved with Gray's drug-trafficking activities, and the stop was lawful.

Gray also argues that the officers here lacked reasonable suspicion because "they were not able to identify him before the stop; there was no traffic violation; and there was no arrest warrant." *Id.* at 5. But police don't need to positively identify a passenger, observe a traffic violation, or obtain an arrest warrant to execute an investigatory stop when other observations provide reasonable suspicion "that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 9 (1989).

## ORDER

The Court denies Gray's motion to suppress (DN 34).

Benjamin Beaton, District Judge
United States District Court

June 10, 2024